We'll turn to the last case on the calendar today, USA v. Lebedev and Gross. Good morning, and may it please the court. Tillman Breckinridge on behalf of Yuri Lebedev. This case comes down to, particularly on the bribery count, a key witness who committed perjury, and then the district court not allowing counsel to explore that perjury with the witness who knew exactly what was said, or should have known exactly what was said. In this situation, there's no dispute in the government's brief over whether he perjured himself, Jose Freund. There's no dispute over whether it was prejudicial. There's no argument of harmless error or anything like that. The only point the government tries to make is that… Mr. Freund, right? Is that how you say his name? Yes, Mr. Freund. And it's the special agent Bayer's testimony? Right, special agent Bayer's testimony. But didn't she say, I didn't say that, that he could give himself a bonus? I said nothing like that. I said something along the lines of the business is continuing, you know, it should continue its usual operations. So that evidence was before the jury from Bayer, right? That evidence from Bayer was before the jury, but there's . . . Didn't that contradict what Freund had said? Well, to the extent that you look at what the government said in its closing at page 3900 of the gross appendix, the government makes it out to be that it was all really just a misunderstanding. And so it wasn't really completely contradictory. And that's part of the problem here because there are actually two infirmities with the assertion that we asked for this. The first infirmity is that the government mischaracterizes the agreement. And I can get to that in a second because the second one goes to your question. We should vacate the conviction against your client because of that limitation on cross-examination? Yes, Your Honor. And what is all the evidence at trial? Yes, Your Honor. The district judge was in firm agreement that this witness was a critical witness on the bribery count. And at pages A3532 . . . I'm sorry, no. At pages A3118, 3119 of the gross appendix, you can see her rationale where she's discussing how important this witness was when she agreed to allow some testimony by Bayer. And given that, yes, and the government has waived any sort of argument of harmless error or lack of prejudice. It hasn't argued it nor should it because Freund was critical to the convictions on the bribery count as stated in our brief and not responded to. Now, getting back to the issue of the change in testimony. And so, first of all, at page A3004, you have the agreement that was stated. You have the limitation that was stated by the district court. And the district court said, and I'll quote the district court on this. It said, I've indicated my inclination to allow Agent Bayer to be questioned in a very tailored and narrow way to get at what I think is relevant and appropriate for the jury to consider here, which is whether a key cooperating witness testified falsely as we discussed. And then she states what the limitation is. What I'm not inclined to allow, because I don't think it's appropriate for the jury to consider, is what steps were taken to diligently chase down what, in fact, Bayer had said. So she limited it to what Bayer had said, not the FBI's steps in determining whether she had actually said this to him. And everyone agreed to that. That was fine. I thought it was just not letting them show her the 302s. Wasn't that it? That was never part of the agreement. I'm not saying the agreement, but wasn't that what counsel wanted to do, was to say what Bayer is saying is not consistent with what she wrote after her interview? Isn't that what it was? Well, sort of. We wanted to show her that to refresh her recollection, because that distinction was key and is what allowed the government to then say, oh, this was just a big misunderstanding. Because Freund testified at page, trial transcript 2147. I apologize, I don't have the appendix page for that. But Freund stated that Bayer told him that COIN.MX would be shut down. And then she gets up in her testimony and she says, well, I didn't know if COIN.MX would be shut down, so I would have told him he can continue operations. And so we have this information, we have Freund's testimony, we have documents showing that she knew that COIN.MX would be shut down. And it's not to challenge her on it in a way that makes her look like a liar. It's rather to refresh her recollection, was Mr. Kreitzman's purpose in wanting to show her that, so that considering the fact that all of her testimony is about what she would have said under the circumstances, this gives her the opportunity to understand that the circumstances were different than she remembers. Because she knew that COIN.MX was going to be shut down, so then she could correct her testimony to say, and we presume she would have corrected her testimony to say, well, gee, actually I wouldn't have said that under these circumstances. I would have said, don't move any money, this is being shut down. That's what we assume she would have said. And that is consistent with the proffer made by the government, which never mentioned any possibility of her saying that he could take money out of the organization or otherwise continue to operate it. And that proffer was made at 829.59 by Ms. Choi. I see I'm out of time. Unless there are any further questions, I'll reserve the remainder for Rupaul. Thank you. May it please the Court. My name is Kristen Santillo on behalf of Defendant Appellant Trevon Gross. In a trial where the jury deliberated for five days before returning a verdict, there were multiple errors that prejudiced Mr. Gross, went to the heart of his good faith defense, and compromised his right to a fair trial. Now I'd like to focus on two of those errors today. The first is the trial court's introduction over the defense's objection of unnoticed, unreliable, and prejudicial expert testimony. The second is the introduction of hearsay statements as co-conspirator statements when there was explicit, unequivocal, and unrebutted evidence that Trevon Gross severed all ties with the declarants. So getting to the first issue. The trial court determined that the government would be allowed to present the testimony of an expert accountant. The reasoning is directly contradictory to the express notice provisions of Rule 16. It's the government's burden to notice the expert and to give the opportunity and chance to respond. The government, before trial, during trial, the morning of his testimony, and even in its appellate brief, contended that this was a summary witness. Nonetheless, once the expert nature of the testimony that the government was going to present became clear, defense counsel objected. Immediately after it became clear, defense counsel objected. It informed the government that it intended to stop, or that it intended to object to the testimony as expert testimony. This was just as to the first-in-first-out analysis of the summaries, right? Yes. How esoteric is that, the first-in-first-out? Just to say, we look . . . what went in first, then we look at what came out, and that's how you determine whether there was a match. How much expert knowledge do you have to have in this world to know that that's a way of looking at records? That's a way. It's one of a number of ways. I think that two, as we cited on pages two and three of our brief, there are two appellate courts that have looked at this issue and have determined that when you have commingled accounts, and you have voluminous records, and that it's the nature of making that analysis is expert. In this case, there's an enormous amount of difference between whether you're applying one method or another. There was no challenge to the evidence itself, right? It was a summary of admissible evidence. There was an agreement, right? We don't challenge these. We didn't challenge the bank records, but there was no correlation. There's nothing in the evidence to make a correlation between the fact that this $150,000 was spent on this massage. And it's absolutely not the case, because this church had income . . . Every Sunday, people were making donations to this church. There's all sorts of ways that money was being distributed from this church that, as the witness himself said, it would be impossible to draw such a direct correlation. Nonetheless, it was a refrain. It was a refrain that the government emphasized in their opening statements, in their summation, and in their rebuttal. Trevon Gross used this money to line his pockets. He used it on massages. He used it on his pool supplies, on Broadway shows. And this case was about whether he was acting corruptly or in good faith. This was an issue that the government knew would go to the heart of that issue. And they have alluded to the fact that, oh, well, maybe of some benefit to the church, there could be a conviction on that basis. But they were not content with that, and they have repeatedly stated that. And I think it's very telling that in their summary of the evidence in this case, they still treat as a fact that those . . . In their statement of facts, that he spent this money on himself, because it was a very important issue in this case. And highly prejudicial. Highly prejudicial. Especially when you had a good faith defense, where Mr. Gross said that he was acting in good faith to benefit the credit union and to benefit his church. So moving on to the next, unless anybody has any further questions on that. I think that United States v. Nerlinger establishes that it is error, if the trial court allows for the introduction of co-conspirator statements in the face of explicit withdrawal. If you look at . . . Were there still transactions with CapCharge after that November meeting? CapCharge was not a declarant in any of these situations. There are three . . . And whether the conspiracy would still continue. Well, the conspiracy, with regard to the collectibles club, was the collectibles club joining the credit union, being members of the board of the credit union, and continuing to . . . and continuing to be a part of the credit union. The government doesn't dispute that Teron Gross forced Anthony Mergio and the other members of the collectibles club out of the credit union. Had no further communications with them from that point forward. At least evidence of Gross concealing material from the agency after that November meeting. Doesn't that show that that conspiracy was continuing? It was not continuing. The collectibles club never stepped foot in the door of the credit union ever again. They never had an account again. They never had money there. They were never on the board there ever again. To the extent that that could properly be characterized as concealment, it was the concealment of a conspiracy that had already concluded. And it is well established that that does not extend the conspiracy for purposes of co-conspirator statements. Is it your argument that these two errors that you cite, while individually might not be enough to earn Mr. Gross a new trial, collectively they do? I think standing alone they would, but I do agree that they all line up around the same issue, which is whether he was acting in good faith. With regard to the evidence to say that he lined his pockets, used the money on trivial purchases like massages and Broadway shows, it's just a callousness as to his character that I think denigrated his character and would have influenced the jury. The second issue is that members of the collectibles club, they maligned his character, they called him greedy, shysty, money-hungry, money-do-unbelievable-things-to-pastors. All of those statements fell outside the scope of the co-conspirator exception because he had explicitly withdrawn from the case. Not only that, but the government expressly made the key point in his case through those statements, which is that bribery equals donation. They said, those are Freud's words, money with a bribery sign. They said that in their summations. So I think those statements were used to great effect at trial. They were role-played during the course of the trial and they were used in summation to effectively establish that this was bribery and that he was in fact money-hungry and that was his motivation, a corrupt motivation when our argument, the defense argument, was that he was acting in good faith. Good morning, Your Honors, and may it please the Court. My name is Daniel Noble. I represent the United States below and I represent the United States on appeal. I'd like to just address the three issues that were raised collectively by counsel and I'd like to begin with harmless error. All three of those issues that were raised today in oral argument are subject to harmless error review. Contrary to Mr. Lebedev's counsel's assertion, we did not waive harmless error with respect to the special agent buyer testimony issue. On page 89 of our brief, we explicitly state that that's subject to harmless error review and all of these errors that are pointed out are subject to harmless error and the evidence in this case, including of Trayvon Gross's bad faith, which was really the key issue at trial, was overwhelming. We had two cooperating witnesses testify, Jose Freund and Ricardo Hill, both of whom paid, were involved in paying the bribes. Trayvon Gross took the stand, testified that it was their understanding that they were paying bribes to this pastor to take over the small federal credit union, which they used in furtherance of not only Coin.mx, but also cap charges operations. The evidence also included the fact that Trayvon Gross repeatedly lied to the National Credit Union Administration in the course of its examinations of the credit union. If he were acting in good faith, if he had honestly believed that he had accepted these donations to his church in a legitimate manner, why lie? Why cover up the scheme? Why not disclose the payments to the National Credit Union Administration? Instead, Gross repeatedly maneuvered behind the scenes to manipulate the examinations. He created and backdated records when the examiners were coming into the bank. He even himself proposed false statements to his co-conspirators that they would supply to the NQA, such as the fact that they had a virtual office located in Lakewood, New Jersey, so that they would qualify under the field of membership requirements. That came from Trayvon Gross. He also proposed to his co-conspirators that they manipulate the net worth ratio in order to cover up the fact that they were processing over $60 million of ACH transactions through an itty-bitty tiny federal credit union that was for low-income designated members, did not have any type of anti-money laundering controls, did not have adequate capitalization in order to process those transactions. He proposed a way to hide that from the NCOA to manipulate the net worth credit ratio. In addition to that, he took the stand and he perjured himself. He lied under oath at trial. If he were truly innocent, if he were acting in good faith, why lie to the jury? Judge Nathan found by a preponderance that he had lied. She applied an obstruction enhancement at sentencing, and that obstruction enhancement is not at issue here on appeal. So there was plenty of evidence that Trayvon Gross acted in bad faith by accepting this money from the Collectibles Club and from CapCharge in order to cede control of the credit union. So with respect to just the merits of the underlying issues, I'll start with Gross since I've been talking about him mostly. With respect to Rollins' testimony, Judge Droney, you asked whether FIFO was really an esoteric concept. It was not. And, in fact, it was applied in this case because it was the most conservative methodology. It, in fact, gave Gross a – You're saying it wasn't expert testimony at all? It's not expert testimony. We all know what FIFO is and that you should use it to analyze summaries of bank transactions? Yes, Your Honor. I mean, it's basic common sense. This is a calculation. Why call an accountant to provide that testimony? Well, we had to provide a summary witness of some sort. We could have called somebody from the agency. We could have called an accountant. No, you didn't. In addition to that, Judge Droney, Judge Nathan specifically instructed the jury that he should not be treated as an expert witness and that he was not there to provide his opinion testimony, but only to provide summary evidence of bank transactions. You instructed him to apply FIFO, right? Wasn't that part of her instruction? That is true, Your Honor. We instructed him to apply FIFO, and that's essentially making an argument to the jury. The government, we could have stood up in summation and done this analysis ourselves. It would have taken a lot more time. We would not have had the benefit of having those slides introduced methodically through a summary witness. But, essentially, what it showed is that you take the money in the bank account, the church's bank account that was there initially, you assume that that's all spent before he starts spending the bribe money. And to be clear, the record shows, the evidence showed, that the $150,000 in bribes was a substantial infusion of cash to this church. It was, you know, not a wealthy church. And so then, from there, you just take the withdrawals, and it was a relatively straightforward calculation. I mean, you can see in the slides yourselves, this is not rocket science. This is not the type of expert summary witness testimony that's required to do the tracing. Does that somehow have to do with the money being spent on personal expenses? Yes, Judge Pooler. A methodology has to be applied. It could be first in, first out. It could be last in, first out. Something has to . . . you have to make some assumption about how the money is used. This is the assumption that the government chose. He analyzed the transactions, didn't he? Well, he analyzed it to the extent that it was necessary to apply . . . That's what makes it sound like an expert witness rather than a fact witness. Well, he did not apply any kind of expert opinion as to the appropriateness of that assumption. He analyzed the transactions. He didn't just say this one was first in, this one was first out. He looked at what they were for, and he analyzed the use of the funds. Well, he clearly performed basic calculations. That is true. But the same type of calculations are applied by IRS revenue agents. Why did you notice him as an expert? Why did you make that decision? Because we did not believe this constituted expert testimony. It didn't require any kind of specialized scientific skill. These were calculations the jury could do themselves. And, you know, I think this could be a . . . excuse my language . . . a damned if you do, damned if you don't situation. Because if we had noticed him as an expert, they probably would have raised the argument that they . . . that was raised in the Ninth Circuit case, Fox, which they raised, that this isn't actually . . . There, the defense argued, this isn't expert testimony. And, by putting the veneer of expert on this witness, it gives him, you know, a greater . . . his testimony greater weight than is necessary. Because these are truly calculations that the jury could have done themselves, which is what . . . How much notice did the defense have of his appearance? Plenty of notice, Your Honor. So, we had noticed him as an expert . . . How much is plenty? Before trial began, and it was a four-week trial, and he was our last witness. So, at least four weeks, we disclosed his . . . a draft of the slides, which clearly showed that . . . that we were going to apply the FIFO methodology. It included a number of slides, which we later removed, to . . . to narrow the . . . They didn't get the slides before the start of trial. They did get the slides before the start of trial. Right at the start of the trial. Right at the start of the trial. But, they had . . . we had noticed at the final pretrial conference that we were going to be calling a summary witness to provide this testimony. I don't know . . . I don't mean to interrupt Judge Cabranes' questions, but didn't you establish his expert credentials when he took the stand? We went through his background, but we didn't seek to qualify him as an expert witness. And, as I said . . . You talked about his . . . you talked about his pedigree and his resume, didn't you? Yes, we did . . . we did ask the questions about his background and where he worked. That's exactly what you would do with an expert witness. So, the jury might have thought he was an expert, because you went through his credentials. Well, we have to assume that the jury follows the instructions of the district court. And, Judge Nathan accurately instructed the jury that he was not an expert witness. He was not testifying there as an expert. And, that they should consider the underlying evidence, not the summary charts or his testimony themselves as evidence, but the underlying bank records. So, if there are any questions . . . further questions on that issue, I'll move on to the other issues. Well, I'm trying to imagine what would have happened if you had identified him as an expert. What . . . if you can reconstruct your own stream of consciousness on this as you approach the trial, why would you not identify him as a witness? Well, Judge Cabranes, as I said earlier, we did not believe that this testimony required expert testimony. I understand. It seems to me that this is a particular problem that you're confronting here, which you need not have confronted, if you had identified him as a witness. So, I guess I'm asking for what your calculation would have been as to whether or not he is to be identified as an expert witness. Sure. So, I think our reasoning was for the reasons I've stated. We didn't think this rose to the level of expert testimony. But, we still made the disclosure that we were going to be calling a summary witness who was going to be applying the FIFO methodology to testify about the tracing. And, that was done pre-trial. And, had they objected, had the defense timely objected, we could have sorted this issue out. Instead, they objected on . . . You identified FIFO specifically pre-trial? Yes. The draft of the slide specifically included that the FIFO methodology, that assumption had been chosen and applied to the analysis. And, it included a preliminary analysis of everything that Rollins testified to at trial. When did the defendants object? So, they objected the weekend before the testimony in e-mails that we had back and forth. And, we wrote back that we didn't believe it was expert testimony. It wasn't actually raised . . . And, if they had . . . Was there a suggestion that they might bring an accountant in also? There was . . . They never suggested that, but Judge Nathan did. Judge Nathan gave them the opportunity to call their own accountant, either a summary witness or an expert witness. She even offered to delay the trial slightly, so they could do so. And, that's the underlying problem here. They had an opportunity to bring in a competing expert witness. Absolutely. Absolutely, Your Honor. And, they never availed themselves of that. And, to this day, they don't point out anything that's wrong in the analysis. And, they don't even point out why it's a particularly difficult analysis to do. This is something that the jury could have done itself. And, the government, you know, during the closing, could have walked them through it. Can I just ask about the co-conspirator statements? Yes, Your Honor. At that November meeting, it sounds like the Collectibles Club people dropped out. So, how were statements by them after November 22nd, I think it was? I think it was the 23rd and 24th that there were some statements by them, right? That's correct. How were those admissible under Rule 801 if they're out of the conspiracy? So, the conspiracy, I think Your Honor alluded to earlier, actually continued. The conspiracy was not just to pay the payments to Trayvon Gross to take over the credit union. It was also to obstruct the examination of the NCOA to make false statements to the NCOA in furtherance of that scheme. In addition, CapCharge and its members were co-conspirators, as we argue with respect to the constructive amendment argument. So, the Collectibles Club members, CapCharge and Trayvon Gross, all continued in a conspiracy to obstruct the NCOA. The Collectibles Club's people continued in the conspiracy after November 22nd? Yes. How? So, for example, they continued to make representations to the NCOA that they were properly members. They sent the letter to the NCOA after the quote-unquote falling out to the NCOA, saying that they were proper members and board members of the credit union. In addition to that, they tried to open another credit union. And throughout the course of those efforts, they continued to conceal and make false statements to the NCOA, just like Trayvon Gross and CapCharge continued to make false statements and obstruct the NCOA's examination of the credit union in furtherance of the scheme to both perpetuate the processing and restart the processing of ACH transactions in 2015, but also to cover up the fact that Collectibles Club and CapCharge had made these payments. It was in everyone's interest not to disclose to the NCOA that these payments had been made. And so we submit that Judge Nathan did not clearly err in determining that Trayvon Gross did not withdraw from the conspiracy because he committed two of the things that this court has said stop or prevent a withdrawal defense. One, he continued to receive benefits. He got further payments from CapCharge, as Your Honor observed. He continued to work at the credit union because they obstructed the examination, made false statements, and covered it up. And in addition to that, not only did he receive the benefits, but he continued to commit additional acts in furtherance of the conspiracy, including withholding the e-mail accounts at the time of the conservatorship from the NCOA. Thanks very much. Thank you, Your Honors. I'm going to give opposing counsel some extra time because, of course, they may need it and deserve it. Thank you, Your Honor. With respect to the harmless error, I did want to just correct the record a little bit on that. I apologize if I was unclear. They state at the bottom of page, the government states at the bottom of page 89, even if Judge Nathan erred in limiting Special Agent Beyer's examination, which she did not, any error is harmless beyond a reasonable doubt in light of the overwhelming evidence of defendant's guilt. There is no argument to support that in any way, shape, or form. There is no response to our argument at page 8 of our brief where we describe the importance of Mr. Freund's testimony. There is no response to the district judge below's discussion at pages A3119 or right around there of the importance of Mr. Freund's testimony. So even though there is an assertion, an unsupported assertion of harmless error, I still think it's waived because they did not actually respond to the discussion in our brief. Unless there are any further questions, I will submit on that. Thank you. Thank you. I wanted to address a few issues, one being the notice issue. The government said they were going to put on a summary witness. They represented that he would be a summary witness at the start of the trial. Midway through trial— Did they give you his name? They did. They said an RSM witness. We didn't receive his resume until March 3rd, which was a couple of days before he testified, and the day before, we identified the issue, which included the 3,500 material, his resume, the backup tracing analysis that would put us on notice that he had the credentials, that they were going to try to qualify him as an expert, and that he would be presented as an expert witness. I guess this is going to your thought processes as well, but who did you think he was? They said he was a summary witness analyzing—or who was going to summarize the bank records. No indication of who he was or what his background—nothing to suggest that he was who he turned out to be. Well, we did not know how their presentation would go. They said from the beginning that they were editing the deck, that it was a draft. It would evolve over the course of the testimony. In the course of a four-week trial, when you are analyzing the luminous exhibits, something that may fall out of the document is not the subject of objections, particularly when there's been no notice that this type of issue was going to be on the radar. What we would have done if we had had notice that it was an expert opinion is challenge it on Daubert grounds, and the court would have had to perform its gatekeeping function. In this case, they said that the trial court clearly erred in saying that we waived the right to make the Daubert challenge. So I think there's two errors. One is they failed to notice it, and the second one is that she inverted the notice requirements of Rule 16. It wouldn't give us a chance to perform that gatekeeping function. And us having a battle with the experts after a week— I think that the gatekeeping function has to come before the expert ever testifies. You don't put on junk science and then put on another junk scientist to rebut that. There's a reason why the judge has to make the preliminary determination, and she expressly abdicated that decision. Was it a junk scientist? No, but I think that it was a prejudicial formula that was applied. FIFO? Yes. And I think that some of the cases that we cited—and obviously, I did not find cases that were in this context with regard to sort of— you're saying how was he influenced by this payment, and they drew a one-to-one specific correlation. Oh, he was influenced by it to get himself a massage. Typically, it's done in completely different other contexts, applying the FIFO methodology. I'm not saying it's never appropriate in any context, but in many contexts, courts have excluded it and said that it was arbitrary. It created a mirage. It inflated losses. So it is an inappropriate formula to particular contexts, and it was inappropriate in this case because it created a false correlation. The government promised the jury it would prove that Gross put this money in his pockets, and this was the only testimony that drew that connection. Mr. Noble suggested you had three or four days to figure out how you might respond to this so-called expert testimony. How did you respond? We told them exactly what our objections were, went back and forth with them over numerous versions of the draft because there were many problems with that. We narrowed the issue to the final slides that we got at 5 o'clock in the morning on the morning that this witness testified and immediately made an objection in court on the morning of his testimony. And the trial court determined that it was a no. What is it that you were prevented from doing in response to the appearance of a credentialed person? That is, what could you have done which you were not able to do? Well, the remedy that we requested was that he not be allowed to testify to this correlation because it was not legitimate, and we weren't given a hearing on that. He could have shown the records. He could have said, oh, these accounts have some overlap, and to the extent there was more money in the church, he could have used it for something else. But he couldn't say he used it on his pool because that's impossible. Was Rollins identified at the pretrial conference by name? They said an RSM summary witness. As I recall, I do not know. What's RSM mean? It's a company that they used. It's an auditing firm, accounting firm, right? Like Price Waterhouse. Yes, but we didn't know who the expert was, what his resume was, what method he was using, what instruction the government gave him. You knew an accountant was going to testify. As a bank, to summarize the bank records. But we didn't know exactly what he was going to be saying because they represented that it was going to be evolving over the course of the trial. And we also didn't have, you know, I think if you read what he said on March 3rd, tonight we will disclose the 3,500 material, his resume, this tracing analysis in the slides, and we're cutting the deck over the weekend. So all of those factors, including the fact that he wasn't noticed, they expressly represented he was a summary witness. I think United States v. Cruz establishes that he should have been held to that representation. He could have testified as a summary witness. We offered suggestions for how he could cut out the slides that were objectionable, could have testified as a summary witness, and made a general statement about overlapping the accounts. Did you say he was the only witness who testified to the personal expenditures? Yes. So he's the only one that created the impression of greed and self-dealing. Yes, except the Coconspirator statements. So I think it was critical. And I would say that to this issue that the trial court said that he was an opinion witness. The government, in its summation, invoked the aura of expert testimony. They said look at his analysis. The numbers don't lie. When defense counsel in the opposition tried to say, look, this is a formula, it doesn't make sense, it's an arbitrary formula, it doesn't make sense, they said, oh, well, Mr. Rollins properly analyzed this under FIFO, and the defense counsel is wrong. And I think you cannot divorce that from the fact that this is a credential witness who is essentially vouching for the government's formula, and he was presented as an expert. Thank you very much, Ms. Santillo. We'll reserve the decision, and we're adjourned.